# STATE OF FLORIDA
# DIVISION OF ADMINISTRATIVE HEARINGS

\*\*,

    Petitioner,

vs.

                             Case Nos. 20-0413E
                                       20-4485E

DUVAL COUNTY SCHOOL BOARD,

    Respondent.

_____/

## FINAL ORDER

Pursuant to notice, a final hearing was conducted via Zoom Conference on December 1 through 3, 2021, before Administrative Law Judge (ALJ) Todd P. Resavage of the Division of Administrative Hearings (DOAH).

### APPEARANCES

| | |
|---|---|
| For Petitioner: | Beverly Oviatt Brown, Esquire<br>Three Rivers Legal Services, Inc.<br>Suite 220<br>3225 University Boulevard South<br>Jacksonville, Florida  32216 |
| For Respondent: | Rita Marie Mairs, Esquire<br>Kelly Hebden Papa, Esquire<br>Office of General Counsel<br>City of Jacksonville<br>117 West Duval Street, Suite 480<br>Jacksonville, Florida  32202 |

### STATEMENT OF THE ISSUES

Pursuant to the parties' Joint Pre-Hearing Stipulation, the issues remaining in this matter are whether Respondent violated the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*., by failing to: (1) "identify Petitioner appropriately" and "to make appropriate placement

considerations"; (2) "follow Petitioner's 2015 behavior intervention plan (if such 2015 BIP was never properly discontinued)"; (3) and "provide the necessary ESE supports to allow for progress appropriate in light of Petitioner's circumstances." Additionally, the parties have expressly requested the undersigned to determine Petitioner's current appropriate educational placement.

P̲R̲E̲L̲I̲M̲I̲N̲A̲R̲Y̲ S̲T̲A̲T̲E̲M̲E̲N̲T̲

Respondent received Petitioner's Request for Due Process Hearing (Complaint) on January 21, 2020. Respondent forwarded the Complaint to DOAH on January 27, 2020, and the matter, DOAH Case No. 20-0413E, was assigned to the undersigned.

On February 6, 2020, the undersigned issued an Order granting the parties' joint motion to extend the resolution period to March 31, 2020. Thereafter, the parties, on March 31, 2020, filed a joint motion to place the matter in abeyance. Said motion was granted.

The matter remained in abeyance, pursuant to several joint motions of the parties until July 14, 2020, when the parties advised they were available for hearing in December 2020. Accordingly, on July 16, 2020, the matter was noticed for hearing for December 1 and 2, 2020.

Respondent received Petitioner's Second Request for Due Process Hearing (Second Complaint) on October 5, 2020. Respondent forwarded the Second Complaint to DOAH on October 7, 2020, and the matter, DOAH Case No. 20-4485E, was assigned to the undersigned.

On October 27, 2020, Petitioner filed an unopposed motion to consolidate DOAH Case Nos. 20-0413E and 20-4485E, which was granted.

On November 30, 2020, in response to the undersigned's Order of Pre-hearing Instructions, the parties filed their Joint Pre-hearing Stipulation, which included the parties' position(s) on the specific legal issues to be determined as well as a concise statement of facts, which are admitted and required no additional proof at hearing. To the extent relevant, the admitted facts are adopted and incorporated in the Findings of Fact below.

The hearing proceeded on December 1, 2020, and concluded on December 3, 2020. Upon the conclusion of the final hearing, the parties stipulated to the submission of proposed final orders on or before January 15, 2021, and to the issuance of the undersigned's Final Order on or before February 15, 2021. On January 15, 2021, Respondent filed its Unopposed Motion for Extension of Time to File Proposed Order. The motion was granted and the parties were provided an extension of time to January 19, 2021, to file proposed final orders and the undersigned's timeline for issuance of the Final Order was extended commensurately.

The hearing Transcript was electronically filed on December 22, 2020. The identity of the witnesses and exhibits and rulings regarding each are as set forth in the Transcript. The parties timely filed proposed final orders, which have been considered in the preparation of this Final Order. Unless otherwise indicated, all rule and statutory references are to the version in effect at the time of the alleged violations.

For stylistic convenience, the undersigned will use male pronouns in this Final Order when referring to Petitioner. The male pronouns are neither intended, nor should be interpreted, as a reference to Petitioner's actual gender.

<u>FINDINGS OF FACT</u>

1. Petitioner is currently 14 years old, in seventh grade, and attending School C, albeit in a hospital/homebound (HH) setting.

2. He began his educational career in Respondent's school district. While the exact date is unclear, it appears that in kindergarten or first grade Respondent found Petitioner eligible for and began providing him exceptional student education (ESE) services under the eligibility category of Other Health Impaired (OHI) due to diagnoses of attention-deficit/hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD).

3. Petitioner attended two separate public elementary schools prior to transferring to a private school for part of third and all of fourth grade.

4. On September 19, 2018, Petitioner enrolled for his fifth-grade year at School A (a public elementary school within Respondent's school district). As he transferred to School A from a private school setting, Petitioner did not have a current individualized education program (IEP). Indeed, his last IEP had been developed when he was in third grade.

5. Ms. Elanna Nesmith, a site coach at School A, credibly testified that, due to his absence from public school, the staff was required to assess Petitioner to determine his current academic level. With respect to reading, he was administered a corrective reading assessment, and based on the results of the assessment, placed in reading group B1, which is below grade level.

6. On October 13, 2018, the IEP team (including Petitioner's mother) met to review and update Petitioner's IEP. During this meeting, the team answered several "IEP Special Consideration" questions, including whether Petitioner exhibited behaviors that impacted his learning or that of others, and whether he had communication needs. The team documented that he did have behavioral concerns and that the IEP team "must develop strategies including positive behavioral interventions and supports in the IEP." The

team also concluded that Petitioner did have communication needs, and the same must be addressed in the IEP.

7. Specifically, his present level of performance with respect to behavior and communication were addressed in the domains of "Social/Emotional, Communication" and "Independent Functioning." The IEP documented that, as a result of his disability, Petitioner does not respond well to being redirected, he has a difficult time staying on task and is easily frustrated, and that this frustration results in verbal aggression towards peers and adults. Accordingly, it was noted that Petitioner requires close supervision or assistance to eliminate eloping behavior and requires working in a small group to provide "the intensive instruction and continuous supervision needed for him to remain safe in the learning environment while supporting effective communication skills."

8. Two separate goals and five benchmark or short-term objectives were developed to address his behavioral and communicative goals concerns. At the same meeting, a Positive Behavior Support Plan (Behavior Plan) was developed to address the target behavior described as follows: "[Petitioner] becomes angry, verbally and physically aggressive with peers when he feels someone is bothering him. He will elope from his current location to other parts of campus when he feels he is given a undesirable task or demand." The severity of this target behavior was documented as "moderate" and noted to occur throughout the day in all settings. The Behavior Plan documented the antecedent to the target behavior, the target behavior, the consequence (what staff was to do), and function of the behavior (the hypothesis of why the behavior was occurring).

9. The Behavior Plan documented how the targeted behavior was to be measured, proposed replacement behaviors, interventions and strategies to be utilized, how the replacement behaviors would be prompted; rewards and reinforcers to increase replacement behaviors; how staff would measure and

react when Petitioner engaged in the target behavior; and how his performance would be monitored.

10. At School A, Petitioner was placed in an ESE self-contained classroom and was part of the "P.R.I.D.E." program. Unlike the typical general education classroom in a comprehensive school, the P.R.I.D.E program offers additional support for behavioral needs. Emotional support and behavior modification classrooms are part of the P.R.I.D.E. program, and the program provides therapeutic mental health counseling (via a licensed social worker), as well as additional staff. Additionally, the P.R.I.D.E. staff are trained in professional crisis management (PCM), which addresses verbal and physical de-escalation techniques.

11. In this program, students begin with daily support from staff members with respect to behavioral issues. When the student demonstrates proficiency, he then "graduates" to weekly support. If the student continues to progress appropriately, he then progresses to "weekly check-ins" from staff members. Ideally, the program is designed to be of limited duration with students being reintegrated or mainstreamed back into general education, to the extent possible. A student's progress is tracked, among other ways, by a point system, wherein a student strives to obtain a maximum of 160 points per day.

12. Within this setting and program, the October 12, 2018, IEP provided that Petitioner was to receive the following services: behavioral contracting, instruction on social skills, small group instruction for all subjects, instruction in replacement behaviors, and instruction in self-monitoring of behavior. The IEP also documented that Petitioner would receive mental health support services twice a month. Additionally, the IEP provided that school personnel would be trained in techniques for classroom/behavior management, crisis prevention, and de-escalation strategies. Finally, Petitioner was to receive the related service of transportation to School A, however, he required "an aide or monitor to increase safety for the student

6

and others on the bus due to student's disability and unpredictable behaviors."

13. With respect to reading, the October 12, 2018, IEP documented that "[d]ue to [Petitioner's] disability he has difficulty reading on his grade level." Indeed, Petitioner, a fifth-grade student, was assessed as reading at a kindergarten level upon enrollment at School A. Accordingly, one of his priority educational needs was "to work with his teacher with reading strategies that will help increase his fluency, comprehension and vocabulary." The IEP provided four separate reading goals and corresponding benchmarks or short-term objectives.

14. Five days after the IEP meeting, on October 17, 2018, Petitioner's mother submitted a written request for an Independent Educational Evaluation (IEE).[1] Although Petitioner had been in private school and out of Respondent's public schools for two years, she averred that, despite his prior receipt of daily math and reading assistance five times per week, he had not made "any progress," and, therefore, "there may be something else going on that has yet to be identified."

15. On October 23, 2018, a conversation was held to address Petitioner's mother's concerns. She was advised that Petitioner's IEP was interim, data was being collected, and an additional meeting would be conducted at the conclusion of the second nine weeks.

16. A meeting was conducted on November 29, 2018, for the purpose of obtaining parent consent to conduct the reevaluation. On that date, Petitioner's mother provided consent for Respondent to conduct cognitive, academic, and adaptive behavior assessments. Consent was also provided to allow the IEP team to obtain and review teacher statements and obtain a social and developmental history.

---

[1] Although the record is unclear, it appears that this request was construed as a request for a reevaluation.

7

17. On January 19, 2019, Susan F. Koster, Ed.S., NCSP, conducted a psychoeducational evaluation of Petitioner. The documented reason for referral was due to academic difficulties and to help determine the extent of his educational placement needs. Petitioner was administered the Wechsler Intelligence Scale for Children-Fifth Edition (WISC-V), which measures "general thinking ability and reasoning skills of children in five primary areas: verbal comprehension, visual-spatial, fluid reasoning, working member, and processing speed." In addition to composite scores for these five areas, a Full Scale IQ (FSIQ) is derived, providing a global indication of the child's overall intellectual functioning.

18. Petitioner's highest score, relatively, was that of the Visual Spatial Index, wherein he obtained a score of 81, which falls within the Low Average Range. He performed most poorly in the Processing Speed and Verbal Comprehension indices where he obtained scores of 69 (Extremely Low range) and 70 (Slow Learner range), respectively. Ms. Koster's report provides that on the WISC-V, "Petitioner earned a Full Scale IQ of 65, which ranks [Petitioner's] overall ability at the 1st percentile, and classifies [Petitioner's] Global IQ as falling within the Extremely Low range." She further documented that "[t]here is a 90% chance that [Petitioner's] true FSIQ is between 61 and 72."

19. Ms. Koster also evaluated Petitioner's academic skills in reading and math via the administration of the Kaufman Test of Educational Achievement, Third Edition (KTEA-3). The Reading Composite of the KTEA-3 provides a comprehensive measure of reading achievement in the areas of letter/word recognition and reading comprehension. Petitioner earned a standard score of 61, which falls within the Extremely Low range.

20. The Math Composite of the KTEA-3 provides a comprehensive measure of mathematics achievement in the areas of computation and math reasoning. Petitioner obtained a standard score of 69 in this area, which also falls within the Extremely Low range. Ms. Koster noted that Petitioner had

difficulty interpreting word problems and required numerous problems repeated several times.

21. In summary, Ms. Koster documented that Petitioner is functioning within the Extremely Low range of intellectual development when compared to other students of his chronological age; and that his academic skills were found to be in the Extremely Low range. Thereafter, she provided 15 possible recommendations for improved learning.

22. Jennifer Whittemore, a social worker at School A, credibly testified that she met with Petitioner weekly for individual therapy or in the classroom for clinician services. She described Petitioner's behavior over the course of the year as ranging from physically aggressive, shutting down, avoiding classwork, and being disrespectful to being very polite, respectful, self-advocating, and a rule follower. In summary, his negative behaviors were up and down. Ms. Wittemore testified that Petitioner progressed through the program during the first semester and had graduated to the level of "natural," whereby he did not require as much support as other students and was on track to regular behaviors consistent with a general education setting. She acknowledged, however, that his behaviors tended to increase towards the end of the 2018-2019 school year, as indicated by the downward trend of his point accumulation. The evidence demonstrated that Petitioner was earning an average of 139 points out of a possible 160 in January 2019; however, that average had dropped to 107 by May 2019. Ms. Wittemore credibly testified that she did not have any difficulty communicating with Petitioner. According to Ms. Wittemore, Petitioner obtained seven disciplinary referrals throughout the 2018-2019 school year while in the P.R.I.D.E. program at School A.

23. Ms. Nesmith similarly testified that Petitioner's behaviors, on balance, improved throughout the course of the year. She explained that when Petitioner became frustrated, he would not listen and become upset. School A staff would then work with Petitioner on his coping skills in an attempt to

calm him. The interventions and strategies, however, were not always successful as Ms. Nesmith credibly testified concerning an incident that occurred on January 11, 2019. On this occasion, staff had to wake Petitioner up while sleeping in class. As a result, he became argumentative with students and began throwing items throughout the room. She acknowledged that, at times, due to his level of frustration, she could not easily communicate with Petitioner.

24. Earline Washington, an interventionist and site coach at School A, worked with Petitioner on his reading mastery as he was reading below grade level. Specifically, on a daily basis, she pulled Petitioner, along with three other students, from class and worked with him on a reading recovery program. She credibly testified that Petitioner was not a behavioral concern for her with the exception that, at some point during the class, he would "shut down."

25. Academically, Petitioner made marginal gains in reading and mathematics throughout the 2018-2019 school year. As of April 25, 2019, his assessment scores demonstrated that he was still functioning at a kindergarten or first grade level in both reading and mathematics.

26. On May 29, 2019, an IEP meeting was held for the purpose of reviewing Ms. Koster's evaluation and considering Petitioner's ESE eligibility. During that meeting, the school-based members of the team determined that Petitioner's primary exceptionality should be changed from OHI to Intellectual Disability (InD). The determination was made based on the determination that Petitioner met eligibility criteria found in Florida Administrative Code Rule 6A-6.03011. The IEP team also determined that for the 2019-2020 school year (beginning on August 12, 2019), Petitioner's educational placement should be changed from the P.R.I.D.E./separate class to a general education classroom with significant inclusion services. The meeting notes document that Petitioner's mother did not wish for Petitioner to remain in the P.R.I.D.E. program. Pursuant to an Informed Notice of

10

Change in Placement and/or FAPE, the documented reason for the proposed change in placement is as follows:

> Based on the results of the evaluation, [Petitioner] is experiencing academic difficulties and is functioning within the extremely low range of intellectual development. Eligibility for the Intellectual Disability program and intervention data determine the extent of his educational placement needs for the general education classroom setting beginning 8/12/19.

27. During this meeting, the team also determined that Petitioner continued to exhibit behaviors that impact his learning or that of others. Petitioner's Behavior Plan was also modified on this date. The Behavior Plan documented that "[t]he most concern observable and measurable goal for [Petitioner] is self advocacy." At this time, the severity of his target behavior was reduced from "moderate" to "mild." It was further determined that Petitioner "will yell out he needs assistance," and that the function or purpose of this behavior is "to obtain attention." As in the previous Behavior Plan, replacement behaviors, interventions/strategies, progress monitoring, and alignment to the IEP are documented. Although the team determined that behavior concerns persisted, it was determined that Petitioner does not demonstrate communication needs.

28. For the 2019-2020 school year, Petitioner enrolled in School B, which is a dedicated magnet program school in Respondent's school district. According to Tamara Feagans, School B's current Principal, all students enter by way of a lottery system, and there are requirements to enter and remain at School B. Truite Moreland, School B's Principal in 2019-2020, testified that while the school serves both genders, boys and girls are segregated, and the school is single gendered in its approach and teachings, with gender-based strategies to facilitate learning in a way specifically tailored to the respective gender needs.

11

29. At School B, the students are required to wear prep-school style uniforms and exhibit leadership behavior. A point system has been developed to monitor behavior infractions. The students are required to adhere to the policy and procedures outlined in the Code of Student Conduct and may not accumulate more than 12 points throughout the entire school year. If a student exceeds 12 points, they can be referred to an alternative school, or dismissed from School B and enroll in their neighborhood school for the balance of the school year.

30. Upon entering School B, Petitioner's May 2019 IEP was controlling. Pursuant to that IEP, Petitioner was placed in a general education classroom setting. On October 30, 2019, an IEP meeting was held and a new IEP drafted. It was noted, as in his previous IEP, that Petitioner continued to have behavioral concerns; however, he did not demonstrate communication needs. Although Petitioner did have a current Behavior Plan that was modified in May 2019, the October 30, 2019, IEP documents that Petitioner did not have a behavior intervention plan (BIP) or a current functional behavioral analysis (FBA).

31. With respect to his present level of performance in Reading/Language Arts, it was documented that his most recent reading assessment, conducted on August 29, 2019, revealed that he was performing at a late first-grade level. Petitioner's primary eligibility remained InD, and the "Effects of the Disability" with respect to Reading/Language Arts were noted as follows:

> Based on data, assessments, teachers' observations and due to the effects of [his] disabilities, [Petitioner] is reading and comprehending at a first grade level. The results from [his] FSA Reading taken on 04/01/19 indicate that [Petitioner] has difficulties in understanding key ideas and details when reading text. Furthermore, the results from [his] assessment show that [he] has difficulties demonstrating grammatically correct usage of standard English and struggles with providing

> textual evidence when summarizing and answering
> text-based questions. His Teachers report that [he]
> will easily become agitated when the classroom
> structure and management is not regimented.
> During classroom transitions and when [he] is not
> engaged, [he] will identify certain students and
> pick fights with them. [Petitioner] may also need
> proximity control and positive reinforcement from
> the teacher to keep track of [his] school work.

32. Concerning his present level of performance in mathematics, the October 2019 IEP documented that a recent diagnostic assessment performed on August 16, 2019, generated an overall score placing him at the second-grade level. The "Effects of the Disability" with respect to mathematics were noted as follows:

> Based on data, assessments and teachers'
> observations, [Petitioner] is working at an overall
> second grade level. According to [his] latest i-Ready
> diagnostic report, [Petitioner] struggles in the area
> of Algebra and Algebraic Thinking and Geometry.
> Based on teachers' observations, [Petitioner] will
> refuse to complete [his] assignments and will on
> occasion rather horseplay with [his] peers. Also, the
> teacher reports that when [Petitioner[ becomes
> frustrated or does not get [his] way [he] will pick up
> items in the classroom and start slamming them on
> the ground or desk. [He] will also take items from
> other students without permission and destroy [his]
> peers [sic] classwork. [He] also walk [sic] out of the
> classroom and wonder [sic] the halls.

33. The October 2019 IEP provided that Petitioner would receive small group instruction in math and language arts via support facilitation. It was determined that none of the following were necessary: related services, special transportation needs, supports for school personnel, and supplementary aids and services. With respect to behavior issues, the

October 2019 IEP merely provided "use proximity control." However, meeting notes from the October 2019 IEP provide that:

> The team will be receiving information from the behaviorist once the test has been completed. The team will reconvene to discuss social/emotional present level of performance. Positive behavior support plan will be completed.

34. On September 17, 2019, Petitioner presented to Edward C. Taylor, Ph.D., a licensed psychologist, for an IEE at public expense. Dr. Taylor performed a psychoeducational evaluation, which consisted of reviewing prior evaluations, educational records, medical history, family history, and administering several psychological assessments.

35. Dr. Taylor administered the Reynolds Intellectual Assessment Scales-Second Edition (RIAS-2) to obtain an overview of Petitioner's educational skills. Dr. Taylor's report noted that "[t]here is a notable discrepancy between his verbal intellect, which is at the .02 percentile, and his nonverbal intellect, which is at the 14th percentile."

36. With respect to information processing, Dr. Taylor's report provided as follows:

> Assessment of [his] memory skills finds a notable discrepancy between [his] verbal memory and [his] visual-spatial memory, 0.1 percentile versus 16th percentile. Attention and concentration when working with both auditory and visual information is weak, 5th percentile.
>
> [He] was administered a number of measures of language skills. The only skill that is not below the 5th percentile is speeded naming, where [he] is at the 25th percentile.
>
> [He] has lowest-average ability to judge the orientation of lines. [He] had considerable difficulty

14

with a measure of visual-spatial analytic-synthetic thinking.

37. At hearing, Dr. Taylor summarized his findings and opinion as follows:

> So based upon my findings and review of all the records, my opinion at that point was that there was likely a language processing disorder at play, which was interfering with [his] learning, and which would have attributed to the behavioral acting out. And I suggested that a comprehensive language assessment be conducted by a speech pathologist. And I also said that I don't think this [fellow] has an intellectual disability. There had been no prior indication from previous assessments of an intellectual disability. And you don't abruptly develop an intellectual disability absent some major trauma to the brain, such as a head injury or chemotherapy or something such as that.

> * * *

> So we had this one outlier score regarding intellect that really had no explanation, but it was out of line with all of the other assessments including mine. So at that point I made the recommendations for a speech and language evaluation to clarify the picture of his language skills and to remove the label of intellectual disability, which was on [his] IEP.

> * * *

> Well, I think the dilemma is that the initial thought, and the thought that has been present all along, is that [his] behavior is derived exclusively from attention deficit disorder. So there has been no formal intervention to address [his] rather substantial language delay, and I think that needs to be done.

38. Dr. Taylor did not determine a FSIQ for Petitioner as he opined that the same would be meaningless based on the discrepancy between his verbal

and non-verbal skills. Dr. Taylor acknowledged that Petitioner's potential academic progress is likely to be limited "give the severity of the language processing problem and his downward influence on his academic development." Regarding Petitioner's limitations over time, Dr. Taylor testified as follows:

> This is a [guy] who, with appropriate educational interventions, could probably successfully complete some vocational technical programs. And they are not going to be language based, and [he] is not going to learn through formal didactic learning environment, because of the language processing issues.

39. On December 20, 2019, Petitioner's counsel provided a copy of Dr. Taylor's report to Respondent and requested a meeting "stat" with Dr. Taylor in attendance. The meeting did not occur prior to the school closure due to the COVID-19 pandemic. For all that appears, the report was not shared with the IEP team until the various meetings that transpired following the Second Complaint at issue.[2]

40. In the 2019-2020 school year, Takita Williams served as a Dean at School B. She credibly testified that she provided support to Petitioner in his reading class. Ms. Williams worked with Petitioner and several other students in a small group setting, and, at times, would pull him into her office (at his election) to continue reading work. She opined that Petitioner was reluctant at times to participate as he was reading below grade level and struggled with fluency of reading and comprehension. Ms. Williams credibly testified that she provided the services required of his IEPs throughout the year.

41. Guisselle Smith was Petitioner's math support facilitator and would pull him out of his math class for small group sessions. Mr. Smith explained

---

[2] Due to the evidentiary presentation, the undersigned cannot discern why the meeting did not occur, and if the same was attributable to the actions or inactions of either party.

he would provide more of a differentiated instruction model based on the IEP goals. Mr. Smith opined that Petitioner was capable of doing the mathematics "after we broke it down."

42. Sean Finn was Petitioner's English/Language Arts teacher at School B during the 2019-2020 school year. Mr. Finn confirmed that Dean Williams provided support to Petitioner in his class during the first semester and advised that Petitioner received additional support by the use of a one-on-one paraprofessional for the balance of the year.

43. The balance of the relevant evidence presented related to the 2019-2020 school year and primarily concerns Petitioner's behaviors. Petitioner received his first disciplinary referral at the inception of the school year on August 14, 2019. Thereafter, from August 26, 2019, through March 5, 2020, Petitioner received 31 additional disciplinary referrals. The disciplinary offenses included disruption in class (12), physical attack of a student (4), harassment (1), confrontation or dispute (7), failure to follow instructions on a bus (1), failure to adhere to safety considerations (3), fighting/mutual combat/altercation (2), and bullying/cyberbullying (1). As a result of these offenses, Petitioner received 12 days of discipline, 4 days of in-school suspension, 4 days of out-of school suspension, and 1 in-class suspension.

44. On October 31, 2019, the day following the IEP meeting, Catrice Thomas, the lead ESE teacher at School B, sent an email to the staff working with Petitioner. The email provided, in pertinent part, as follows:

> Just a reminder that [Petitioner] will have a behavior tracking from that he will be receiving from Dean Williams this morning. Please make sure to complete it every day and also document any behaviors [Petitioner] displays in your classroom either in a composition book or online and please submit it at least once every two weeks. We are focusing on what starts the behaviors and what the behaviors are. This documentation will help when meeting with his behaviorist as well as

17

> providing information needed to complete his
> Functional Behavioral Assessment and eventually
> his Behavior Intervention Plan.

45. The behaviorist referenced above is William Kendrick, a Board-Certified Behavior Analyst, retained by Petitioner's mother in May 2019 to provide an assessment of Petitioner and provide a behavioral treatment plan for home. Although the record is not clear on this point, it appears that, in January 2020, Mr. Kendrick was able to obtain access to observe Petitioner in his science and history classroom. His services were discontinued by Petitioner's mother in February 2020.[3] Ultimately, he did not coordinate with the staff at School B in conducting an FBA or BIP. While Mr. Kendrick's testimony included several opinions concerning what he believed may be beneficial or helpful to Petitioner in his educational programming, he provided no opinions relative to whether Respondent violated the IDEA, as alleged in these consolidated complaints.

46. Documentary evidence confirms that the staff at School B were tracking and gathering data on Petitioner's behaviors no later than January 2020. This behavior monitoring continued until it appears that in-person school attendance was discontinued due to the COVID-19 pandemic. Petitioner's report card for the first semester provides that he received As, Bs, and Cs in his academic courses.[4]

47. Petitioner returned to School B for the start of the 2020-2021 school year. His tenure there was short-lived, however, and he enrolled at School C, a public middle school on or about September 15, 2020. During the brief time Petitioner was at School B, behavioral issues persisted.

48. On August 24, 2020, one teacher reported that Petitioner antagonized another student to the point where Petitioner had to be removed from class. On the same day, another teacher reported that Petitioner failed to follow

---

[3] Petitioner's mother retained Mr. Kendrick's services at a subsequent point in time.

[4] The undersigned has been unable to locate from the record Petitioner's final report card.

instructions. Two days later, on August 26, 2020, it was alleged that Petitioner "pulled a pair of scissors on another student in class and attempted to fight the student." The following date, on August 27, 2020, Petitioner's mother inquired as to the status of an FBA.

49. Dean Williams testified concerning another disciplinary incident that occurred on September 9, 2020. On this occasion, Petitioner was alleged to have verbally harassed a female student calling her names such as "whore" and "slut." The following day, Petitioner received a referral for disruption in class.

50. At this early juncture in the school year, Petitioner had accumulated 13 disciplinary points at School B. A telephonic conference was held to discuss the same and how the issue may be resolved based on School B's disciplinary point system. Although the record is unclear, it does not appear that Petitioner was formally dismissed from School A.

51. As noted above, Petitioner enrolled in School C on September 15, 2020, where he remained until November 1, 2020. Petitioner's IEP had not been amended since October 30, 2019, and, therefore controlled his educational placement and services.

52. The witnesses consistently testified that, although his IEP did not provide for additional personnel, Petitioner transferred to School C with a paraprofessional assigned to him. Additionally, supports were in place including additional ESE support personnel who provided assistance to all ESE students twice per week.

53. Petitioner continued to exhibit behavioral issues in the general education setting. Gailya Stuart, one of Petitioner's teachers, testified that, in general, Petitioner's behavior was very disruptive. She explained that for the majority of time "he was always getting into it with another student," or "yelling out" in class. She credibly testified that his behavior was very disruptive to the learning of the other students.

54. Petitioner's behavioral incidents transcended merely being disruptive to learning and, at times, tended towards violence. As occurred at School B, Petitioner also engaged in fighting other students. On October 5, 2020, Petitioner engaged in fighting with another student and failed to follow teacher directives once the fight was over. As a result of the incident, he received an out of school suspension. Two days later, Petitioner's Second Complaint was filed.

55. Additional evidence was presented by both parties concerning activity that transpired after the Second Complaint was filed. The undersigned will not consider said evidence in making the final determination in this matter with the exception (as requested by the parties) of evidence concerning an educational placement decision made by the IEP team on November 10, 2020, and various educational placement programs provided by Respondent. This limited evidence is discussed below.

56. On November 10, 2020, an IEP meeting was conducted where, inter alia, the team discussed Petitioner's educational placement in the least restrictive environment (LRE). In considering this issue, the IEP documented the following:

> Student exhibits frequent frustration and stress, Student requires extensive, direct academic instruction, Student exhibits frequent off task behavior, Student has a need for communication development, Student needs increased supervision for safety, Student has difficulty with emotional control, Student exhibits a need for social skill development, Student has difficulty completing tasks

57. The recommended educational placement set forth in the IEP is a separate class placement where Petitioner spends less than or equal to 40% of his time with non-ESE students. The meeting notes generated from the meeting further document that the school-based members of the IEP team

20

were proposing a self-contained placement to address behavioral, social-emotional, and academic needs. Specifically, the proposed self-contained placement was within the P.R.I.D.E. setting. Petitioner's mother and counsel were not in agreement with the P.R.I.D.E. setting.

58. Amy Valentine, Respondent's Supervisor of Low Incident Support Group, testified concerning several education placement settings available in Duval County. She first described the Supported Level of Academics (SLA) setting. This setting is only available to students participating in the access points curriculum. It is not available to students, such as Petitioner, who is currently participating in the general standard curriculum.

59. Ms. Valentine then testified concerning the Communication Social Skills (CSS) setting. In this setting, which is a self-contained program, some students are participating in access points (approximately 40%) and some on the general standards. Many of the students in this setting have autism spectrum disorder or a related disability. Accordingly, the students IQs can vary considerably, many of the students have social skills deficits and are non-verbal in their communication. Accordingly, the communication services provided are or can be quite different from those provided to students with communication issues in the P.R.I.D.E. or general education setting.

60. In the self-contained version of the CSS program, there is additional staff (interventionists, site coaches) to provide extra support. The CSS program can be implemented in a regular middle school setting whereby students have access to the additional staff.

61. With respect to a placement setting dealing with emotional behavioral issues, Ms. Valentine described the P.R.I.D.E. setting, which Petitioner has previously been a participant. Most of the students in this setting are on the general standards curriculum.

62. All three settings (SLA, CSS and P.R.I.D.E.) are small classrooms with a teacher and at least one paraprofessional. CSS and P.R.I.D.E. also have site

coaches and sometimes, behavior interventionists. In the CSS and P.R.I.D.E. settings the staff are trained in PCM.

CONCLUSIONS OF LAW

63. DOAH has jurisdiction over the subject matter of this proceeding and the parties thereto pursuant to sections 1003.57(1)(b) and 1003.5715(5), Florida Statutes, and rule 6A-6.03311(9)(u).

64. Petitioner bears the burden of proof with respect to each of the claims raised in the Complaint. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

65. In enacting the IDEA, Congress sought to "ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasized special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *Phillip C. v. Jefferson Cty. Bd. of Educ.*, 701 F.3d 691, 694 (11th Cir. 2012). The statute was intended to address the inadequate educational services offered to children with disabilities and to combat the exclusion of such children from the public school system. 20 U.S.C. § 1400(c)(2)(A)-(B). To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements. *Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 654 (11th Cir. 1990).

66. Local school systems must satisfy the IDEA's substantive requirements by providing all eligible students with FAPE, which is defined as:

> Special education services that--(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in

22

> the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).

67. "Special education," as that term is used in the IDEA, is defined as:

> [S]pecially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including-- (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings. . . .

20 U.S.C. § 1401(29).

Identification Claim:

68. The IDEA also contains "an affirmative obligation of every public school system to identify students who might be disabled and evaluate those students to determine whether they are indeed eligible." *N.G. v. D.C.*, 556 F. Supp. 2d 11, 16 (D.D.C. 2008)(citing 20 U.S.C. § 1412(a)(3)(A)). This obligation is referred to as "Child Find," and a local school system's "[f]ailure to locate and evaluate a potentially disabled child constitutes a denial of FAPE." *Id.* Thus, each state must put policies and procedures in place to ensure that all children with disabilities residing in the state, regardless of the severity of their disability, and who need special education and related services, are identified, located, and evaluated. 34 C.F.R. § 300.111(a).

69. Rule 6A-6.0331 sets forth the school districts responsibilities regarding students suspected of having a disability. This rule provides that school districts have the responsibility to ensure that students suspected of having a disability are subject to general education intervention procedures. As an initial matter, the school district has the "responsibility to develop and implement a multi-tiered system of support which integrates a continuum of academic and behavioral interventions for students who need additional support to succeed in the general education environment." Fla. Admin. Code R. 6A-6.0331(1).

23

70. The general education intervention requirements include parental involvement, observations of the student, review of existing data, vision and hearing screenings, and evidence-based interventions. Fla. Admin. Code R. 6A-6.0331(1)(a)-(e). Rule 6A-6.0331(1)(f) cautions, however, that nothing in this section should be construed to either limit or create a right to FAPE or to delay appropriate evaluations of a student suspected of having a disability.

71. Here, Petitioner had previously been evaluated and determined eligible for ESE. If the school district determines that the educational or related service needs, including improved academic achievement and functional performance, of the student warrant a reevaluation or if the student's parent or teacher requests a reevaluation, the school district must ensure that it is conducted in accordance with rule 6A-6.03011-.0361. *See* Fla. Admin. Code R. 6A-6.03311(7).

72. Here, a reevaluation was conducted at School A and Petitioner's Proposed Final Order contends that Respondent subsequently failed in its duty to identify and determine Petitioner eligible under the categories of language impaired (LI) and emotional/behavioral disability (EBD). As support for the failure to identify and determine Petitioner eligible as LI, Petitioner relies upon the evaluation of Dr. Taylor, wherein he opines that Petitioner has a language processing disorder that has been unaddressed to date.

73. The undersigned finds that Dr. Taylor is well-qualified to render his opinions in this matter; however, as he has only been in Petitioner's presence on one occasion in a clinical setting, his opinions are given less weight than that of the education professionals who have had an opportunity to observe Petitioner in his educational environment on a routine basis. Succinctly, while it may be ultimately determined that Petitioner does, in fact, have a language processing disorder, Petitioner failed to present sufficient evidence to establish that Respondent violated the IDEA in failing to identify him as LI.

74. The argument that Respondent failed to properly identify Petitioner as EBD is on stronger footing. Significant evidence was presented that Petitioner has persistent and consistent emotional or behavioral responses that adversely affects his (and other students') performance in the educational environment. Indeed, it was his behavioral concerns that resulted in his initial placement in the P.R.I.D.E. setting and one of the current reasons Respondent advocates for his return to that setting. As set forth above in the Findings of Fact, Petitioner has sustained multiple disciplinary infractions.

75. That Respondent did not conduct a formal evaluation to determine Petitioner as eligible under the EBD category, however, does not result in a violation. The IDEA provides that, in developing each child's IEP, the IEP team must, "[i]n the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i); Fla. Admin. Code R. 6A-6.03028(3)(g)5. Here, at all times pertinent, the IEPs and Behavioral Plans created for Petitioner addressed his behavioral concerns, and provided appropriate positive behavioral support services and staffing to address the same.

Failure to Provide Necessary Support Claim:

76. The components of FAPE are recorded in an IEP, which, among other things, identifies the child's "present levels of academic achievement and functional performance"; establishes measurable annual goals; addresses the services and accommodations to be provided to the child, and whether the child will attend mainstream classes; and specifies the measurement tools and periodic reports that will be used to evaluate the child's progress. 20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.320. "Not less frequently than annually," the IEP team must review and, as appropriate, revise the IEP. 20 U.S.C. § 1414(d)(4)(A)(i). "The IEP is the centerpiece of the statute's

education delivery system for disabled children." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017)(quoting *Honig v. Doe*, 108 S. Ct. 592 (1988)). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).

*A. IEP Development:*

77. Petitioner's Proposed Final Order contends that Respondent failed to provide the necessary support by failing to develop an appropriate IEP to address his behavioral issues.

78. In *Rowley*, the Supreme Court held that a two-part inquiry must be undertaken in determining whether a local school system has provided a child with FAPE. As an initial matter, it is necessary to examine whether the school system has complied with the IDEA's procedural requirements. *Rowley*, 458 U.S. at 206-07. A procedural error does not automatically result in a denial of FAPE. *See G.C. v. Muscogee Cty. Dist.*, 668 F.3d 1258, 1270 (11th Cir. 2012). Instead, FAPE is denied only if the procedural flaw impeded the child's right to FAPE, significantly infringed the parents' opportunity to participate in the decision-making process, or caused an actual deprivation of educational benefits. *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525-26 (2007). Here, Petitioner does not advance a procedural argument.

79. Pursuant to the second step of the *Rowley* test, it must be determined if the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive "educational benefits." *Rowley*, 458 U.S. at 206-07. Recently, in *Endrew F.*, the Supreme Court addressed the "more difficult problem" of determining a standard for determining "when handicapped children are receiving sufficient educational benefits to satisfy the requirements of the Act." *Endrew F.*, 13 S. Ct. at 993. In doing so, the Court held that, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress

appropriate in light of the child's circumstances." *Id.* at 999. As discussed in *Endrew F.*, "[t]he 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials," and that "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Id.*

80. Whether an IEP is sufficient to meet this standard differs according to the individual circumstances of each student. For a student who is "fully integrated in the regular classroom," an IEP should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* For a student, like Petitioner, not fully integrated in the regular classroom, an IEP must aim for progress that is "appropriately ambitious in light of [the student's] circumstances." *Id.* at 1000.

81. Additionally, deference should be accorded to the reasonable opinions of the professional educators who helped develop an IEP. *Id.* at 1001 ("This absence of a bright-line rule, however, should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review" and explaining that "deference is based on the application of expertise and the exercise of judgment by school authorities.").

82. Here, the undersigned finds and concludes that Petitioner failed to present sufficient evidence to establish that Respondent did not offer Petitioner an IEP reasonably calculated to enable him to make progress appropriate in light of his circumstances with respect to his behavioral issues. As discussed above, Respondent provided Petitioner with IEPs and Behavioral Plans that properly used positive behavioral interventions, supports, and other strategies, to address his documented behaviors.

*B. IEP Implementation*:

83. The undersigned also construes the stipulated issue of "failing to provide the necessary ESE supports" as an allegation that Respondent failed to implement Petitioner's IEPs.

84. In *L.J. v. School Board*, 927 F.3d 1203 (11th Cir. 2019), the Eleventh Circuit Court of Appeals confronted, for the first time, the standard for claimants to prevail in a "failure-to-implement case." The court concluded that "a material deviation from the plan violates the [IDEA]." *L.J.*, 927 F.3d at 1206. The *L.J.* court expanded upon this conclusion as follows:

> Confronting this issue for the first time ourselves, we concluded that to prevail in a failure-to-implement case, a plaintiff must demonstrate that the school has materially failed to implement a child's IEP. And to do that, the plaintiff must prove more than a minor or technical gap between the plan and reality; de minimis shortfalls are not enough. A material implementation failure occurs only when a school has failed to implement substantial or significant provisions of a child's IEP.

*Id.* at 1211.

85. While declining to map out every detail of the implementation standard, the court did "lay down a few principles to guide the analysis." *Id.* at 1214. To begin, the court provided that the focus in implementation cases should be on "the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld." *Id.* (external citations omitted). "The task for reviewing courts is to compare the services that are actually delivered to the services described in the IEP itself." In turn, "courts must consider implementation failures both quantitatively and qualitatively to determine how much was withheld and how important the withheld services were in view of the IEP as a whole." *Id.*

86. Additionally, the *L.J.* court noted that the analysis must consider implementation as a whole:

> We also note that courts should consider implementation as a whole in light of the IEP's overall goals. That means that reviewing courts must consider the cumulative impact of multiple implementation failures when those failures, though minor in isolation, conspire to amount to something more. In an implementation case, the question is not whether the school has materially failed to implement an individual provision in isolation, but rather whether the school has materially failed to implement the IEP as a whole.

*Id.* at 1215.

87. Here, Petitioner presented sufficient evidence to establish that, during the first semester (fall) of the 2019-2020 school year, Respondent failed to implement his IEP and Behavior Plan with respect to behavior. As discussed in the Findings of Fact, upon entering School B, Petitioner's May 2019 IEP was controlling. At that time, Petitioner had a current Behavior Plan that was to be implemented.

88. Although the Behavior Plan was current and appropriate, sufficient evidence was presented to establish that the staff at School B was unaware of the Behavior Plan. Indeed, the October 30, 2019, IEP that was developed noted that a Behavior Plan was not in existence. Sufficient evidence was further presented that, although Petitioner was demonstrating significant behavioral concerns, the directive to monitor and chart his behaviors did not occur until the end of the first semester, and the documentary evidence supports the finding that the monitoring and charting did not actually begin until approximately February 2020.

89. The undersigned concludes that Petitioner presented sufficient evidence to find this failure to implement was material to the implementation

of his IEP as a whole. It is concluded that for the balance of the time period at issue, Respondent materially implemented Petitioner's IEPs.

<u>Educational Placement:</u>

90. The IDEA provides directives on students' placements or education environment in the school system. Specifically, 20 U.S.C. § 1412(a)(5)(A), provides as follows:

> Least restrictive environment.
>
> (A) In general.   To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

91. Pursuant to the IDEA's implementing regulations, states must have in effect policies and procedures to ensure that public agencies in the state meet the LRE requirements. 34 C.F.R. § 300.114(a). Additionally, each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. 34 C.F.R. § 300.115. In turn, the Florida Department of Education has enacted rules to comply with the above-referenced mandates concerning LRE and providing a continuum of alternative placements. *See* Fla. Admin. Code R. 6A-6.03028(3)(i) and 6A-6.0311(1).

92. In determining the educational placement of a child with a disability, each public agency must ensure that the placement decision is made by a group of persons, including the parent(s), and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement

options. 34 C.F.R. § 300.116(a)(1). Additionally, the child's placement must be determined at least annually, based on the child's IEP, and as close as possible to the child's home. 34 C.F.R. § 300.116(b).

93. With the LRE directive, "Congress created a statutory preference for educating handicapped children with nonhandicapped children." *Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 695 (11th Cir. 1991). "By creating a statutory preference for mainstreaming, Congress also created a tension between two provisions of the Act, School districts must both seek to mainstream handicapped children and, at the same time, must tailor each child's educational placement and program to his special needs." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir, 1989).

94. In *Daniel*, the Fifth Circuit set forth a two-part test for determining compliance with the mainstreaming requirement:

> First, we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. See § 1412(5)(B). If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Daniel*, 874 F.2d at 1048.

95. In *Greer*, the Eleventh Circuit adopted the *Daniel* two-part inquiry. In determining the first step, whether a school district can satisfactorily educate a student in the regular classroom, several factors are to be considered: 1) a comparison of the educational benefits the student would receive in a regular classroom, supplemented by aids and services, with the benefits he will receive in a self-contained special education environment; 2) what effect the presence of the student in a regular classroom would have on the education of other students in that classroom; and 3) the cost of the supplemental aids and

services that will be necessary to achieve a satisfactory education for the student in a regular classroom. *Greer*, 950 F.2d at 697.

96. One of the stipulated issues in this proceeding is the allegation that Respondent "failed to make appropriate placement considerations." Petitioner's Proposed Final Order raises no specific argument that any of Petitioner's educational placements prior to the filing of the Second Complaint were inappropriate or amount to a violation of IDEA. Additionally, there was insufficient evidence presented to conclude that any of the educational placements preceding the filing of the Second Complaint were appropriate.

97. The parties, however, have requested the undersigned determine Petitioner's current appropriate placement. In doing so, they are requesting the undersigned consider the placement proposed by Respondent subsequent to the Complaints filed in this proceeding. With respect to Petitioner's current education placement, the undersigned declines to accept the invitation to opine and order the parties with respect to a particular set of educational programming or methodology, as that is within the sound discretion of the educational authorities. The undersigned will, however, as expressly requested by the parties, address whether a separate class placement, as recommended by Respondent at the November 10, 2020, IEP meeting, is appropriate.[5]

98. Petitioner is currently advocating for placement in the CSS program. As noted above, the CSS program may be administered in a general education or a separate class setting. It is unclear from Petitioner's Proposed Final Order which setting Petitioner seeks.

99. While there was some credible testimony that Petitioner may have parroted negative behaviors exhibited by other students in the P.R.I.D.E. placement, on balance the undersigned concludes that the nonacademic

---

[5] "Separate class" means a class in which a student spends less than 40 percent of the school week with nondisabled peers. § 1003.57(1)(a)1.e., Fla. Stat.

benefits available from interaction with non-exceptional students in a general class setting is not sufficient to tip the scales towards placing Petitioner in a general education setting. The evidence presented established that Petitioner's behaviors can and has impeded his learning and that of others and has been overall disruptive to the learning environment. No evidence was presented concerning the costs associated with his educational placement.

100. Applying the legal analysis set forth above to the facts of this case, the undersigned finds and concludes that, at this time, Petitioner cannot be satisfactorily educated in the general education environment. It is further concluded that Respondent has attempted to mainstream Petitioner to the maximum extent appropriate. In summary, it is concluded that a separate-class placement as proposed by Respondent is appropriate. As discussed above, within the separate class placement, the undersigned defers to Petitioner's IEP team to make the appropriate professional decision regarding programming in light of his unique circumstances.

Compensatory Education:

101. As discussed above, the undersigned concludes Respondent denied Petitioner FAPE by failing to materially implement his IEP during the first semester of the 2019-2020 school year, to which Petitioner is entitled to compensatory education. In calculating an award of compensatory education, the undersigned is guided by *Reid v. District of Columbia*, 401 F.3d 516, 523 (D.C. Cir. 2005), wherein the D.C. Circuit emphasized that IDEA relief depends on equitable considerations, stating, "in every case . . . the inquiry must be fact specific and, to accomplish IDEA's purposes, the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id*. at 524. The court further observed that its "flexible approach will produce different results in different cases depending on the child's needs." *Id*.

102. This qualitative approach has been adopted by the Sixth Circuit and a number of federal district courts. *See Bd. of Educ. v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007) ("We agree with the district court . . . that a flexible approach, rather than a rote hour-by-hour compensation award, is more likely to address [the child's] educational problems successfully."); *Petrina W. v. City of Chicago Pub. Sch. Dist.*, 2009 U.S. Dist. LEXIS 116223, at \*11 (N.D. Ill. Dec. 10, 2009)("Because a flexible, individualized approach is more consonant with the aim of the IDEA . . . this Court finds such an approach more persuasive than the Third Circuit's formulaic method."); *Draper v. Atlanta Indep. Sch. Sys.*, 480 F. Supp. 2d 1331, 1352-53 (N.D. Ga. 2007) (holding that, in formulating a compensatory education award, "the Court must consider all relevant factors and use a flexible approach to address the individual child's needs with a qualitative, rather than quantitative focus"), *aff'd*, 518 F.3d 1275 (11th Cir. 2008); *Barr-Rhoderick v. Bd. of Educ.*, 2006 U.S. Dist. LEXIS 72526, at \*83-4 (D.N.M. Apr. 3, 2006)(holding that an award of compensatory education "must be specifically tailored" and "cannot be reduced to a simple, hour-for-hour formula"); *Sammons v. Polk Cty. Sch. Bd.*, 2005 U.S. Dist. LEXIS 45838, at \*21-2 (M.D. Fla. Oct. 7, 2005)(adopting *Reid's* qualitative approach).

103. Against this legal backdrop, the evidence establishes that Petitioner is entitled to specialized instruction in emotional behavior, as set forth (and in the amount provided) in the May 2019 IEP, as compensatory education, from the first school day of the 2019-2020 school year, through the last school day of 2019 (as calculated by the school calendar).

ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that:

1. Petitioner presented sufficient evidence to establish Respondent failed to materially implement Petitioner's IEP and is entitled to compensatory education as set forth above;

2. A self-contained educational placement setting, at this time, is appropriate; and

3. Petitioner failed to present sufficient evidence to support the balance of the claims asserted, and, therefore, the same are dismissed.

DONE AND ORDERED this 18th day of February, 2021, in Tallahassee, Leon County, Florida.

TODD P. RESAVAGE
Administrative Law Judge
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 18th day of February, 2021.

COPIES FURNISHED:

Beverly Oviatt Brown, Esquire
Three Rivers Legal Services, Inc.
Suite 220
3225 University Boulevard South
Jacksonville, Florida  32216

Victoria Sears Gaitanis
Dispute Resolution Program Director
Department of Education
325 West Gaines Street
Tallahassee, Florida  32312

Amanda W. Gay, Esquire
Department of Education
325 West Gaines Street
Tallahassee, Florida  32399

Kelly Hebden Papa, Esquire
Office of General Counsel
117 West Duval Street, Suite 480
Jacksonville, Florida  32202

35

Rita Marie Mairs, Esquire
Office of General Counsel
City of Jacksonville
117 West Duval Street, Suite 480
Jacksonville, Florida  32202

Stanley M. Weston, Esquire
Office of General Counsel
City of Jacksonville
117 West Duval Street, Suite 480
Jacksonville, Florida  32202

Matthew Mears, General Counsel
Turlington Building
Suite 1244
325 West Gaines Street
Tallahassee, Florida 32399-0400

Julian Moreira
Educational Program Director
Bureau of Exceptional Education
  and Student Services
Department of Education
325 West Gaines Street
Tallahassee, Florida  32399

Dr. Diana Greene
Superintendent
Duval County Public Schools
1701 Prudential Drive
Jacksonville, Florida  32207-8152

NOTICE OF RIGHT TO JUDICIAL REVIEW

This decision is final unless, within 90 days after the date of this decision, an adversely affected party:

> a) brings a civil action in the appropriate state circuit court pursuant to section 1003.57(1)(c), Florida Statutes (2014), and Florida Administrative Code Rule 6A-6.03311(9)(w); or
> b) brings a civil action in the appropriate district court of the United States pursuant to 20 U.S.C. § 1415(i)(2), 34 C.F.R. § 300.516, and Florida Administrative Code Rule 6A-6.03311(9)(w).

36